Appellant was convicted of second degree murder of Michael Crump and sentenced to twenty years' imprisonment by a Jefferson County Circuit Court jury.
The State's first witness was Jean Obenauf, the victim's sister. According to Mrs. Obenauf, the victim owned a shotgun and a .357 pistol. The last time Mrs. Obenauf saw the victim was in late January or early February, 1979, at his apartment on the south side of Birmingham.
The witness testified that the victim also owned a turquoise ring and a necklace with a bull's head pendant attached. She stated that she saw the victim's pistol when she went to see him at his apartment. She also described the victim's automobile, which was a green Camaro.
After her last visit with the victim in January or February, 1979, Mrs. Obenauf repeatedly attempted to contact her brother, without success. Finally, in April, 1979, the victim's landlord let her in her brother's apartment in order to move out his possessions. Mrs. Obenauf noticed that the victim's possessions were there except for a pistol, a quilt, a guitar and his automobile. Mrs. Obenauf moved the victim's possessions out of the apartment and never heard from him again.
Mrs. Obenauf stated that her brother had made periodic visits to his dentist, Dr. Paul J. Longshore. The victim had bridge work done on the right side of his mouth.
The State called Dr. Paul J. Longshore to the stand. Dr. Longshore testified that the victim was his patient. Dr. Longshore identified some of the victim's dental records and described various dental work he had performed on the victim.
Some time in 1979, Dr. Longshore met Dr. Ronald Rivers, a forensic pathologist, at Cooper Green Hospital. Dr. Rivers showed Dr. Longshore the lower jaw of a human skeleton. After comparing the jaw with his records, Dr. Longshore determined that the jaw was that of Michael Crump.
Randall Smith took the stand for the State. Mr. Smith was a laborer for the City of Hoover Street Department in 1979. He and other employees were often near the uncompleted section of I-65 near Hoover. In April of 1979, he and the other employees noticed a foul odor at the end of a dirt road near the interstate construction. In June of 1979, Mr. Smith noticed a dark area in the drainage ditch by the dirt road. Protruding from the ditch were apparently human skeletal remains covered with rotted clothing and natural debris. *Page 1116 
Mr. Smith identified a picture of the general location where he found the body and he identified a picture of the remains.
The State then called Kenneth Bearden, a truck driver who drove a City crew that included Mr. Smith. He testified that, on June 1, 1979, Mr. Smith had run out of the woods very excited about something. Mr. Bearden went back with Mr. Smith and saw a body in a ditch.
David Cummings, Chief of the Hoover City Police Department, was contacted by the City employees and led to the body. After seeing the body, the Police Chief called Detective Harold Murdock.
Detective Murdock testified that, on June 1, 1979, he was directed to the location of the body. He described the area as a dead-end dirt road scattered with trash. He stated that the body was a short distance from the dead-end road and it was in an advanced stage of decomposition. He turned control of the area over to Sergeant Lynn Moore of the Jefferson County Sheriff's Department.
Sergeant Moore testified that he was called to the area. He turned over control of the area to Deputy Coroner Charles C. Roby and Dr. Ronald Rivers.
Dr. Roby received a call around 1:45 p.m. on June 1, 1979. He was directed to the scene of the body. He observed the deceased lying in a shallow grave in a drainage ditch covered with straw and limbs. He measured the body and estimated it to be from five feet eight inches to five feet ten inches tall.
He noticed a necklace with a bull's head pendant around the neck of the body and also observed turquoise rings on one of the hands. He put the body in a body bag and transported it to Cooper Green Hospital.
Dr. Ronald Rivers, a forensic pathologist and Chief Medical Examiner in 1979, performed an autopsy the next morning. He determined the cause of death to be shock and hemorrhage due to a shotgun blast. He observed a fractured cheek and jawbone which he determined was caused by a blow across the head with a blunt object.
Dr. Rivers, after performing the autopsy, called Dr. Longshore to see if Michael Crump's dental records matched that of the body. He also showed the records to Dr. Seymore Hoffman, a forensic odontologist.
Dr. Hoffman testified that he was contacted by Dr. Rivers to look at the jaw of the body and dental records of Michael Crump. After comparing x-rays of the jaw with Michael Crump's dental records, he stated that his opinion was that the body was the remains of Michael Crump.
Martha Elizabeth Franklin was called to the stand. She had met Michael Crump in November of 1978 and had dated him steadily until his disappearance in February of 1979. She also knew appellant.
The last time Ms. Franklin saw the victim was in February of 1979 at his apartment. Appellant was also at the apartment and was still there when she left around 2:00 p.m. to meet an insurance adjustor at a local restaurant.
When she returned to the victim's apartment at around 4:00 that afternoon, no one was there. The apartment looked as it had when she left earlier, except that the victim's pistol was on a coffee table and his dog was not there.
Ms. Franklin later saw appellant that night at a girl friend's house. Appellant was dating one of Ms. Franklin's friends. Appellant told her that he had not seen the victim, nor did he know where he was. Ms. Franklin never saw the victim again.
The next morning Ms. Franklin again saw appellant at her friend's house. Appellant told her that the victim had a date with another girl the night before and this other girl had spent the night with the victim at his apartment. Ms. Franklin went with appellant to the victim's apartment to get her personal belongings. The victim was not there and everything appeared normal. She gave appellant her key to the apartment and asked him to put it in appellant's mailbox. She also wrote appellant a note asking him to call and explain.
A couple of days later Ms. Franklin had still not heard from the victim, but she got *Page 1117 
word that his dog had been found about one-half mile from appellant's apartment.
Ms. Franklin testified that she had met appellant through the victim and that the two men seemed to be close friends. When she saw appellant the night after the last time she saw the victim, appellant did not appear to have mud or dirt on him.
On redirect examination, Ms. Franklin stated that appellant drove her to pick up the lost dog and told her that the victim had moved to Atlanta and was living with another girl.
Rebecca Edwards, a friend of Ms. Franklin and roommate of the girl appellant dated, testified that she knew appellant and saw him frequently in February and March of 1979. She also knew the victim and the last time she saw him was in February, 1979.
She further testified that she, her roommate, and appellant were discussing the unusual disappearance of the victim. Appellant said that he would try to find out where the victim was. He went to the phone and appeared to call someone. After talking on the phone, he told the women that he had been talking with a mutual friend of his and the victim, Ricky Maddow. He told them that, according to Mr. Maddow, the victim had gone to Atlanta and then was going out west.
Ricky Maddow was called to the stand. He testified that he knew appellant but had never known the victim. He also testified that he did not remember having a conversation with appellant in early 1979 about the victim.
Ray Nevin testified that he knew appellant in early 1979 and had a business transaction with him during that time. Mr. Nevin bought a .357 pistol from appellant. Mr. Nevin identified a State exhibit as the pistol he had purchased from appellant and later turned over to Sergeant Moore.
George Riddle also knew appellant and was involved in a business transaction with him. Mr. Riddle bought a 1970 model green Camaro automobile from appellant. Mr. Riddle identified a bill of sale he made when he bought the car. He bought the car on February 20, 1979. Mr. Riddle wrote down the tag number and the vehicle registration number on the bill of sale.
Thomas Daniels, an insurance claims adjustor for National Security Fire and Casualty Company, testified that he met Ms. Franklin in Birmingham on February 13, 1979, and discussed insurance business with her.
The State's next witness was Ricky Seals. Mr. Seals knew appellant and lived near the area where the victim's body was found. Mr. Seals stated that he and appellant had been in the general area where the body was found on numerous occasions. In his opinion, appellant was familiar with the general area.
Mrs. Jean Obenauf was again called by the State. She testified that, when she removed the victim's possessions from his apartment in April, she also removed appellant's mail from his mailbox. There was no key in the mailbox.
Judge Wallace Wyatt, Probate Judge of St. Clair County, identified certified copies of the victim's tag receipt. After comparing the receipt with the bill of sale made out when appellant sold a Camaro to George Riddle, Judge Wyatt testified that both the tag decal numbers and the vehicle registration numbers were the same.
Jacob Powell owned the Center Point Gun Bar in 1979. He identified documents that he was required to keep by state and federal law whenever a gun was sold. This particular document was a record of a gun sale to the victim. The victim bought a .357 Ruger Speed Six pistol. The serial number of the gun was on the registration document. After comparing the serial number on the document with the gun identified by Mr. Nevin as the pistol he bought from appellant, Mr. Powell determined that the numbers were the same.
Tom Holdenfield, who was in charge of the Survey Department for the State Highway Department, determined the location of the body in relation to the Jefferson County line by triangulating various points. *Page 1118 
In his opinion, the body, although located in Shelby County, was within 300 to 400 feet of the Jefferson County line.
Jack L. Barnes, appellant's stepfather, identified a State's Exhibit as a shotgun he owned. He said the gun was a J.C. Higgins .12 gauge shotgun. He possessed the gun until February or March of 1977, when he let appellant keep the gun until April of 1979 and the sheriff obtained the gun from him (appellant's stepfather).
David Guthrie, Deputy Sheriff for the Jefferson County Sheriff's Department, testified that he made a rough sketch of the area where the body was found. He also retrieved various paper items near the body, hoping to find an address. Deputy Guthrie also turned over to the Department of Forensic Sciences a sealed envelope and a shotgun that he had obtained from Deputy Sheriff James Howell.
Deputy Howell, who worked with the evidence collecting unit, found two .12 gauge shotgun shell hulls while searching the area near the body. He bagged and tagged the evidence and gave it to Deputy Guthrie, who gave the evidence to the Toxicology Department.
Deputy Howell identified one of the two .12 gauge shell hulls that he found. It was a hull from a Remington Peters .12 gauge shotgun. He also identified a J.C. Higgins .12 gauge shotgun that he took possession of from Sergeant Lynn Moore and subsequently turned over to the Department of Toxicology.
Sergeant Lynn Moore was recalled to the stand. Sergeant Moore identified the pistol he received from Ray Nevin. He was able to identify the gun because he initialed it when he received it from Mr. Nevin.
The State's last witness was Lawden Yates, a firearms examiner for the Department of Forensic Sciences. Mr. Yates received a Bachelor of Science Degree from Auburn University in Laboratory Technology and had received firearms identification training while at the Department of Forensic Sciences. He had also attended many seminars on the subject of firearms identification, and he belonged to various professional associations.
Mr. Yates made various tests with the J.C. Higgins .12 gauge shotgun which belonged to Jack Barnes, appellant's stepfather. Mr. Yates bought the same type of .12 gauge shotgun shells that were found near the body. Based on the markings that particular J.C. Higgins gun made on the shells when fired, it was Mr. Yates' opinion that the shell casings found near the body were shot from Mr. Barnes' J.C. Higgins .12 gauge shotgun.
After the State rested, the defense called Andrew Payne to the stand. Mr. Payne was retired from the Air Force where he worked with weapons and continued to do so as a hobby. He was then employed as a consulting engineer.
Mr. Payne also performed tests using the J.C. Higgins gun. In his opinion, the gun did not make distinctive enough marks on shells when fired. Thus, his conclusion was that there was no way to determine whether a shell was shot from that gun or not.
Appellant, after the close of the State's case in chief, moved that the case be dismissed because of the insufficiency of the evidence. This was also one of his grounds in a motion for new trial. We find, as appellant apparently conceded in oral argument, that the State presented sufficient evidence for the case to go to the jury, and the guilty verdict was supported by the evidence.
The uncontradicted evidence supporting a finding of guilt is as follows: (1) The victim was last seen alive with appellant. (2) When asked if appellant knew what had happened to the victim, appellant pretended to call a mutual friend and then fabricated a conversation in which the friend supposedly knew the whereabouts of the victim. (3) Appellant, after the disappearance of the victim, sold the victim's car for cash. (4) Around the time of the victim's disappearance, appellant sold the victim's pistol for cash. (5) There was testimony that appellant was very familiar with the general area where the victim's body was found. *Page 1119 
(6) The victim's dog was found near where the appellant lived.
Finally, possibly the strongest evidence produced by the State was that the shotgun used to kill the victim was in appellant's possession during the time of the victim's disappearance.
Although the State was compelled to rely on circumstantial evidence, such evidence may afford satisfactory proof of the corpus delicti in a murder conviction. Further, if facts are presented from which the jury may reasonably infer the crime has been committed, the question must be submitted to the jury.Richardson v. State, Ala.Cr.App., 376 So.2d 205, cert. denied, Ala., 376 So.2d 228 (1979); Brown v. State, Ala.Cr.App.,331 So.2d 820 (1976); Clark v. State, 54 Ala. App. 217, 307 So.2d 28
(1975).
In reviewing a conviction based on circumstantial evidence, this court must view the evidence in light most favorable to the prosecution. The test to be applied is whether the jury might reasonably find that the evidence excluded every reasonable hypothesis except that of guilt; not whether such evidence excludes every reasonable hypothesis but guilt, but whether a jury might reasonably so conclude. Cumbo v. State, Ala.Cr.App., 368 So.2d 871, cert. denied, Ala., 368 So.2d 877
(1979).
We believe the question of guilt was properly submitted to the jury and the conviction was supported by the evidence.
The fact that the firearms testimony was conflicting was a fact for the jury to decide. Richardson, supra.
Appellant contends that there was insufficient evidence to prove venue. He argues that the State's witness testifying on the subject improperly based his opinion on hearsay in the form of an unauthenticated, uncertified construction project map.
The State attempted to show venue under § 15-2-7, Code of Alabama 1975. This section allows a case to be brought in one of two adjoining counties when an offense is committed within one-quarter of a mile of either boundary. In the present case, it was undisputed that the body was found in Shelby County close to the Jefferson County line.
The record is somewhat confusing because of the use of two different maps during the questioning. The State called Mr. Tom Holderfield, who was in charge of a survey department for the State Highway Department. He had worked for the Department for 24 years, and had been working on the I-65 Interstate project near the Shelby-Jefferson County line for four or five years.
Mr. Holderfield testified that he was called to the scene the day the body was found. By the method of triangulation, he determined the location of the body in relation to the known points, two right-of-way markers. Mr. Holderfield stated that he used a construction project map in making the determination of how far the body was from the Jefferson-Shelby County line. Mr. Holderfield was also asked if he was familiar with an aerial map of the area. After replying that he was, he indicated on the map where he believed the county line to be.
According to Mr. Holderfield, based on his triangulations and knowledge of the location of the county line, the body was within 300 to 400 feet of the line. He also testified that one-quarter mile was 1320 feet.
Appellant objected to the testimony because the proper predicate had not been laid in order for the witness to give evidence based on the construction map. After the witness on cross-examination testified that he would not use the map to buy a piece of property, the trial court withdrew the map from evidence. The State also asked that the map be withdrawn. However, the opinion that the body was within one-quarter mile of the county line, which was based on the construction map, was before the jury.
After the close of the State's evidence, appellant made a motion to exclude the State's evidence concerning the venue question. The motion was denied. *Page 1120 
Although the trial court possibly erred in allowing the expert witness to give an opinion based on improperly admitted evidence any error was rendered harmless by the witness's subsequent testimony. Dossett v. State, 19 Ala. App. 496,98 So. 359 (1923).
On voir dire, the trial court asked the witness if based on his own personal knowledge of the county line, without any reference to the disputed survey map, he had an opinion and, if so, what it was. The witness testified that, based on his personal knowledge of the area, the line he drew on the aerial map adequately represented the county line, and the body was found within one-fourth mile of that line. He reiterated this testimony in front of the jury.
Venue may be proven by circumstantial evidence, and the county line may be proven by general reputation and knowledge as to its location instead of expert survey testimony. Nolen v.State, 35 Ala. App. 249, 45 So.2d 786 (1950); Granberry v.State, 184 Ala. 5, 63 So. 975 (1913). Thus, the testimony was properly admitted.
In Yelton v. State, 294 Ala. 340, 317 So.2d 331 (1974), our Supreme Court held that testimony apparently illegal upon admission may be rendered prejudicially innocuous by subsequent legal testimony to the same effect or from which the same facts can be inferred. In light of Yelton, any possible error was cured by the admission of the legal evidence.
Moreover, Yelton, supra, also held that a defendant is not prejudiced by testimony of a witness which related to uncontradicted matters. Although the form of proof was contested, there was no evidence offered that tended to contradict the State's evidence that the body was found within one-fourth mile of the county line. We find no improper prejudice resulted in proving venue.
Appellant further contends that the trial court improperly applied the law concerning jury challenges. At the time the crime was committed in early 1979, § 12-16-150 (8), Code of Alabama 1975 allowed for the challenging for cause of jurors over the age of 65. On March 4, 1981, this provision was deleted. Act 81-97. Trial was held on March 26, 1981. Appellant argues that the statute in effect at the time of the crime should apply and not at the time of the trial. He thus contends that the trial court should have allowed him to strike from the jury for cause two people who were over 65 years of age.
Whether the new statute applies or not turns on the determination of whether the statute affects a substantive right or merely is procedural in nature. Generally, statutes dealing with procedural or remedial matters apply retrospectively. Harlan v. State, 31 Ala. App. 478, 18 So.2d 744
(1944); South v. State, 86 Ala. 617, 6 So. 52 (1889). Conversely, those statutes affecting vested rights or altering legal status, being substantive, are denied retrospective application. Harlan, supra; Barrington v. Barrington, 200 Ala. 315,76 So. 81 (1917).
We believe that this statutory change was procedural in nature.
We recognize that the right to challenge for cause is inherent in the right of trial by an impartial jury. Sorter v.Austen, 221 Ala. 481, 129 So. 51 (1930). However, the right to challenge for cause involves procedural due process in that it is but one of the procedural methods or modes of trial in which the substantive due process right of trial by an impartial jury is reached. The legislature decided before appellant's trial that one of these procedural methods was no longer necessary in insuring such a substantive right, thus the maximum age limit was dropped. The substantive right to trial by an impartial jury was not affected by the change, only the procedure used to insure such a right.
Although dealing with preemptory challenges, South v. State,86 Ala. 617, 6 So. 52 (1889), is applicable. In South, our Supreme Court stated:
 "Manifestly, laws of this class affect the remedy, — the procedure by which actions are maintained and defended and determined. They in no degree affect the right itself. As to crimes, their effect is *Page 1121 
in no sense to make an action criminal which was innocent when done, or to add to the criminality of an offense after its commission, or to increase the punishment, or to authorize a conviction on less or different testimony than that required when the crime was committed. Relating, as they do, to procedure, laws of this character may be modified at any time by the legislature, and as modified will apply in all subsequent proceedings, with respect to offenses committed before as well as those committed after their adoption." (Emphasis added.)
Thus, the trial court properly applied the law at the time of the trial, not at the time of the crime.
We have searched the record for errors affecting the substantial rights of appellant and have found none. The judgment of conviction is affirmed.
AFFIRMED.
All the Judges concur.