Appellant was indicted for the offense of murder, in violation of § 13A-6-2, Code of Alabama (1975). After appellant waived his right to a trial by jury, the evidence was presented to the trial court ore tenus, and appellant was convicted of murder. Pursuant to the provisions of the Alabama Habitual Felony Offender Act, the appellant was sentenced to life without parole. From this conviction and sentence, appellant has filed the present appeal. As grounds for this appeal, appellant argues that: (1) appellant's confession was improperly admitted into evidence; (2) the State failed to prove corpus delicti; and (3) the trial court improperly denied the appellant's pro se motion for discovery. For the reasons outlined below, these arguments are decided against the appellant and the decision of the trial court is due to be affirmed.
Although the sufficiency of the evidence is not an issue on appeal, an outline of the relevant portions of the testimony presented at the trial court level is set out herein.
WAYNE PARKER
On behalf of the State, Wayne Parker, Assistant Chief of Police and Chief Investigator, was called to the stand. According to Parker's testimony, the appellant was in jail on a matter unrelated to the present case when he volunteered to give Parker certain information. In particular, the appellant asked Parker if he would "like to know where there was a body." After this conversation, the appellant led Parker (along with John Paul Johnson and Edward White) to the place where the body of the deceased, Stanley Carvine Tucker, was found. The trip to the "mountain" where the body was found occurred on April 20, 1983. At that time, the appellant told the witness that Tucker had been killed by "Cosmos" Hurst.
Parker identified State's Exhibit # 1 as a photograph which showed the decomposed body as it appeared that day. Approximately one month and three days had elapsed between the time that Tucker was killed and the time that his body was discovered and this picture was taken. Additionally, Parker identified State's Exhibit # 2, which showed a recent picture (within six months) of the deceased as he appeared before his death.
On April 21, 1983, at 12:26 p.m., a search of the appellant's premises was made with the appellant's consent. At that time, Parker did not have a search warrant and was looking for clothing that might belong to the deceased. As a result of the search, a suitcase was taken into custody by the police.
On the night of April 26, 1983, the appellant called Parker at home and told him he wanted to talk to him. After Parker gave the appellant his Miranda rights, a statement was made. The statement was taken at 8:52 p.m., instead of during regular hours, because it was made at the specific request of the appellant. Parker stated that he was contacted by the appellant at his home that night and "did not contact Mr. Todd in reference to the statement." At the time the statement was made, Parker testified that the appellant did not appear to be under the influence of any drugs and appeared to be aware of what he was doing and saying.
JOHN PAUL JOHNSON
On behalf of the State, John Paul Johnson, Detective, Ft. Payne Police Department, testified that he went with Investigator Parker in April of 1983 to Sand Mountain *Page 709 
to search for the body of a possible murder victim. Once the body was located, Johnson stayed with the body until it was removed by the evidence people.
EDWARD C. WHITE
On behalf of the State, Edward C. White, Forensic Lab Analyst, State of Alabama, testified that he went with Detective Johnson and Investigator Parker to the mountain to search for a possible murder victim. The body of the deceased was located, and White stated that the body was that of a white male. White stated that the body was turned over to the state pathologist, Dr. Aguilar. When recalled to the stand, White testified that the body of the deceased was fully clothed at the time it was delivered to Dr. Aguilar. Both the body and the clothes were turned over to Dr. Aguilar between 4:00 p.m. and 5:00 p.m.
NOEL HICKS
On behalf of the State, Noel Hicks, Investigator, DeKalb County Sheriff's Department, testified that he accompanied Parker and others to Sand Mountain in April, 1983, when the body was found. Approximately one week later, Hicks was told by Johnny Payne that a jacket could be found where the body was located. Based on this information, Hicks went back to the scene and, with the help of Johnny Payne, recovered a vinyl leather jacket. Hicks testified that the jacket had not been retrieved at the time the body was discovered because it was hidden under a rock near the water and could not be seen unless one knew that it was there.
Hicks further testified that he talked to Linward Hurst[1]
concerning a pistol which he had purchased from the appellant. Hurst surrendered to Hicks a .38-caliber pistol, which was put into the evidence box, along with other evidence. The witness also testified that he was present when the appellant's home was searched and observed blood on the walls of the house. According to the appellant, however, the blood on the walls was the result of the appellant "shooting-up" drugs.
DOT NORRELL
Because of some time limitations, this witness was called to testify out of turn. Mrs. Norrell was called on behalf of the defendant and testified that she is the Director of Medical Records at the Baptist Medical Center in Ft. Payne. Based on her verification, a xerox copy of a report dated April 19, 1983, describing the treatment of James Harry Todd was admitted into evidence as Defense Exhibit # 1.
EDDIE WRIGHT
On behalf of the State, Eddie Wright, Investigator, DeKalb County Sheriff's Department, testified. This witness testified as to certain items of evidence and their chain of custody. Certain items of clothing were identified and marked as State's Exhibit # 6. Additionally, some personal items belonging to the deceased were found on April 26, 1983, and these items were also marked as exhibits. This witness stated that he participated in a search of the appellant's "Section residence."[2]
COSBY LINWARD HURST
On behalf of the State, Cosby Linward Hurst[3] testified that he had seen the appellant some three or four times in March or April of 1983. Hurst stated that his dealings with the appellant concerned the possible sale of a car. When there was some question about the title of the car, however, Hurst told the appellant that he did not want to get involved. On March 20, 1983, the appellant asked Hurst if he would like to buy a pistol. Although Hurst purchased the pistol, he later sold it. When he *Page 710 
was subsequently questioned about the gun, he retrieved the pistol, bought it back, and gave it to Investigator Hicks. After Hurst identified State's Exhibit # 4 as an old "Allen-head" or "lemon squeezer," he stated that he was "nearly positive" that this was the same gun he had bought from the appellant.
On cross-examination, Hurst stated that he was not an authority on guns and had simply gone back to the boy that he had traded it to in order to retrieve it. Hurst also testified that he had been convicted of murder and was out on bond at the time the police officers talked to him concerning the gun. Hurst added, however, that he did not have any "deal" with the district attorney's office. Since he did not know the serial number of the gun, Hurst stated that he could not "swear to it" that it was the same gun.
DONNIE WAGNER
On behalf of the State, Don Wagner, Deputy Sheriff, DeKalb County Sheriff's Department, testified that he had taken certain evidence items to the lab.
BRENT WHEELER
On behalf of the State, Brent Wheeler, Criminalist, Alabama Department of Forensic Sciences, Huntsville, testified. He identified State's Exhibit # 4 as an "H R caliber .38 S W which is 38 short top break 5 shot revolver." As to State's Exhibit # 6, this witness testified that the bag contained a shirt, jeans, belt, and socks. These items were received April 21, 1983.
CHUCK NELSON
On behalf of the State, Chuck Nelson, Deputy Sheriff, DeKalb County Sheriff's Department, testified that State's Exhibit # 7 consisted of certain documents, personal papers, and a property bond in the name of Stanley Tucker. These items were found on the morning of April 26, 1983, at the top of the mountain near a trash dump.
CHARLES McGEE
On behalf of the State, Charles McGee, merchant and bondsman, testified that he had received money from Stanley Tucker's family in March of 1983 to make his bond. After getting Tucker out of jail, McGee took him to the bus station so that he could return home. While they were waiting, Tucker went across the street to Wendy's to make a phone call. When he returned, Tucker got his suitcase and went back to Wendy's, and that was the last time that this witness saw him. This occurred on March 15, 1983.
McGee identified State's Exhibit # 5 as the suitcase which Tucker had with him on this date. Additionally, this witness identified Tucker as the person in the photograph which was marked as State's Exhibit # 2. This witness testified that the deceased was wearing blue jeans and tennis shoes on the day in question, as well as a belt with a "different type buckle." At that point, State's Exhibit # 6 was identified by the witness as the buckle which Tucker wore that day.
On cross-examination, McGee testified that Tucker had been in jail on a burglary charge. Additionally, he testified that it would not be unusual for inmates to trade or swap a belt buckle or coat or "anything else" with someone else in jail for cigarette money. On re-direct, this witness testified that on March 15, 1983, Tucker was wearing this particular belt buckle.
LARRY MORGAN
On behalf of the State, Larry Morgan testified that he was in the same jail cell as Tucker in March of 1983. This witness identified Tucker from State's Exhibit # 2 as the person in the photograph. On March 15, 1983, Tucker was released from jail and took a suitcase, a pair of white Nike tennis shoes, and a brown coat that the witness gave to him. Morgan identified State's Exhibit # 5 as a suitcase "exactly like" the one that Tucker had when he left the jail.
The witness also stated that Tucker had several tattoos on his body. These tattoos included one which had "jeannie" across his arm and another that said "freedom is love" or "love is freedom" across his chest. Additionally, there was another tattoo on Tucker's left shoulder. In April of 1983, *Page 711 
Morgan accompanied Investigator Hicks and other police officers to the place where the body had been found. At that time, Morgan and Mark Jackson flipped a coin to see who would go into the water to retrieve a jacket. Mark went into the creek and returned with a brown jacket that was "rolled up in a rock." State's Exhibit # 3 was identified by this witness as the jacket which he had given to Stanley Tucker. This witness also testified that State's Exhibit # 6 was the belt buckle that had been traded to Tucker while he was in jail.
JOHNNY DALE PAYNE
On behalf of the State, Johnny Dale Payne testified that he knew the appellant. At that time, the court had an off-the-record discussion with the attorneys. The testimony resumed and the court informed Payne of his rights. Although the court specifically warned Payne of his right against self-incrimination, the witness stated that he had talked with his attorney and wished to testify.
Johnny Payne stated that he had known Stanley Tucker and identified him as the person in the picture identified as State's Exhibit # 2. The last time that Payne saw Tucker was on March 16, 1983, the day he was shot. On that morning, the witness stated that he went to the appellant's house and Tucker was there. Payne, along with Tucker and the appellant, went to a bootlegger to get some whiskey and then took Tucker to the bus station. Since the bus would not be coming in for another two or three hours, they decided to get some liquor and ride around. After drinking and driving for a while, they stopped so that Tucker could shoot a .38 pistol, which belonged to the appellant. When they ran out of shells, they went to Ft. Payne and got some more shells at a hardware store.[4] Tucker purchased the bullets, as well as a knife. After this, they drove up to Sand Mountain to a place where the appellant had said his brother had a still. They traveled off a dirt road to a place where the still was supposed to be and then got out of the car. As he walked down the hill, Payne heard shots. When he turned around, Payne realized that the appellant had shot Tucker. According to Payne, the appellant unloaded the whole gun, but he did not know how many times he hit Tucker. Payne testified that Tucker ran a little piece and then fell down on his side. Before he died, Tucker asked the appellant "why did you shoot me?" And the appellant replied "because I am going to kill you."
Payne stated that the appellant started going through Tucker's clothes, took $40 out of Tucker's coat pocket, and gave $20 to Payne. The appellant also took Tucker's billfold and shoes, but gave Tucker's knife to Payne. Together, Payne and the appellant removed the jacket from Tucker's body. Then, they tied a rock to the jacket and threw it into the creek. The witness identified State's Exhibit # 3 as the coat that they had removed from Tucker's body. The witness then drove the appellant to McDonald's to get something to eat. On the way to McDonald's, Tucker's billfold and shoes were thrown down the side of the mountain.
On cross-examination, Payne testified that on March 16, when all this happened, he was 19 years old. Prior to that time he had "around two DUI's" and had been convicted of another one since that time. He also testified that there was no deal or understanding with the District Attorney about his testimony with this case. On the day in question, the trio went to two different bootleggers to get liquor. They got three pints of liquor in Ft. Payne and obtained another pint from a bootlegger on Sand Mountain. The three of them drank four pints of liquor between 8:00 in the morning and 5:00 in the afternoon. The witness stated that he decided to tell the authorities that the appellant had committed the murder when he found out that the appellant said that he had killed Tucker. *Page 712 
JAMES HARRY TODD
For the limited purpose of explaining the circumstances surrounding the statement which he had made, the appellant took the stand in his own behalf. The appellant stated that he was 26 years old and was in the city jail in Ft. Payne, Alabama, in April of 1983. On April 19, 1983, he was taken to DeKalb County General Hospital for a shot to treat his withdrawal symptoms from certain "street drugs." (Prelude, Pyridum, Demoral, and Mepergan) In order to explain the presence of blood on the ceiling and the walls of his house, the appellant testified that "when I would clean my syringe out, I would just squirt it out on the walls, because I was going to move, you know. . . ." During the time that he was in jail, the appellant was able to obtain quaaludes from his girlfriend, who brought them to him in jail. On April 26, 1983, when he gave the statement, he had taken quaaludes and mepergan.
On cross-examination, the appellant testified that if he had not taken drugs before giving the statement, he would have been "in bed somewhere," since they helped to calm him down. Additionally, the appellant testified that he could only remember "parts" of the statement and did not remember being read his rights. The appellant stated that he had requested that the jailer get in touch with Mr. Parker, because he was afraid his girlfriend was going to leave the State in order to avoid getting arrested or losing her kid. Although he made the statement, he testified that he knew that Mr. Parker "wasn't suppose to take that statement . . . because I was under the influence of drugs." The appellant agreed that he was alert enough to try to protect his girlfriend; to have someone call Investigator Parker; to know what his rights were; and to know that he was going to give a voluntary statement. However, he was so influenced by the drug that, according to the appellant, he knew that the statement would not be admissible. The witness testified that he had, on other occasions, lied to the police in order to get out of trouble. Additionally, he said that although the statement, which was taped, was not the truth, his testimony in court was truthful. The appellant stated that he would tell a lie if it would benefit him, but he was not lying now (even though he was up for murder) since he was already serving two life sentences. The appellant admitted that he could now get life without parole if convicted, but stated that he would not get out anyway unless he escaped from prison. Not only had he escaped before, he said, but he was also "gonna do it again."
At this point, the court allowed the appellant's tape-recorded statement to be played. After his rights were explained to him, the appellant agreed that he had called Investigator Parker and asked to talk to him. After this, the appellant began to give his version of the events in question. Around 9:00 p.m. on March 15, the appellant was at Wendy's and Tucker came in. Since they had known each other from jail, Tucker came over and spoke to the appellant. After a brief conversation, Tucker left and came back with his suitcase. They then went to the appellant's house where Tucker spent the night. The next morning, Tucker prepared to leave but decided to wait when it started to rain.
After a while, Johnny Payne drove up and they all went to get some liquor. They also went to the bus station to find out how much Tucker's bus ticket would cost. Since the appellant always carried his .38 "lemon squeezer, Smith Wesson" with him, the pistol was in the car with the trio. After a while, they went to Lookout Mountain and the appellant let Tucker shoot the pistol several times. After they got another pint of liquor, they went to Sand Mountain. During this time, they were riding in Johnny Payne's mother's car. Payne let Tucker drive the car, then got mad when Tucker "hot-rodded the car a little bit." They also stopped and got some more shells for the pistol at a hardware store.
According to the statement, the appellant and Payne decided to "get rid of the son-of-a-bitch because he was drunk and talking crazy, you know." At first, "get rid of" *Page 713 
referred to making Tucker get out of the car, but then Payne said "we ought to just go ahead and kill the son-of-a-bitch." After a while, they drove up to Sand Mountain to the place "out there where I took you to the dead man." The appellant took Tucker into the woods and told him they were looking for a whiskey still. In explaining how he shot Tucker, the appellant stated:
 "All right man. I shot him first. I — damn — man — (laughs) — I did. He asked me. `What you want to shoot me for, man?' And Johnny snatched the gun out of my hand and finished shooting him, man, and he run up the damn — then he run up the hill. I didn't think he was hit. I know I hit him but —"
The appellant stated that Tucker was shot five times. After shooting him, the appellant and Payne took the jacket off of the body, tied a rock around it, and threw it in the creek. They then took Tucker's knife, billfold, money, identification, and shoes. On the way back down the mountain, they threw the shoes out the car window. They also threw some things out at the garbage dump. They threw everything away except the money.
Since the appellant "wanted him buried or something," he decided to tell the authorities where the body was, but to implicate Cosmos Hurst. The appellant stated "it got to eating at me, that man lying out there in them damn woods. It got to bothering me, and I wanted him out of them woods." Before he was killed, Tucker seemed to "suspect something"; he seemed to know that he was going to be killed. After the murder, the appellant sold the pistol he had used to Cosmos Hurst for $65.00.
The appellant also stated that the brown suitcase which Investigator Parker retrieved belonged to Tucker, who had left the suitcase at the appellant's house. Although he took all the clothes out of the suitcase and threw them away, the appellant kept the suitcase. The appellant stated that he threw away the white tennis shoes and everything that was in the suitcase because "I know how it is in jail. Everybody marks their things, you know, puts their name on it and I threw everything away that was in that suitcase."
DR. JOSEFINO AGUILAR
On behalf of the State, Dr. Aguilar, Forensic Pathologist, State of Alabama, testified that on April 20, 1983, he examined the body of an unknown individual. Although the body was badly decomposed, certain tattooed letters were noted on the chest: the letters E, I, S, F, R, E, E, D, and O. Since the skin and the flesh of the chest were missing, all of the tattooed letters were not identifiable. Additionally, there was a homemade tattoo on the left arm consisting of a cross and the letters S.S. The wounds in the subject were consistent with bullet wounds. Although Dr. Aguilar recovered two bullets from the body, he could not give an opinion as to their caliber. The witness identified the clothing marked as State's Exhibit # 6 as the clothing which was retrieved from the body. According to Dr. Aguilar, the cause of death was gunshot wounds of the chest, or to the chest.
Since the hands were missing from the victim's body, no fingerprints of the subject could be taken. There was also no identification by dental examination. Assuming that only the clothing and the tattoo were used to identify the body, the witness said that the odds were "one out of four" that the identity of the victim was correct.
After the State rested, the defense attorney moved to exclude the evidence for failure to establish the corpus delicti. The court denied the motion, and defense counsel called Chief Parker to the stand for additional cross-examination. After questioning the witness concerning the police use of thePhysician's Desk Reference book (P.D.R.), xerox copies of certain pages were admitted into evidence as Defense Exhibit # 2. According to defense counsel, these pages discussed the side effects, contraindications, and warnings for the use of mepergan and quaaludes. At this point, the defense rested.
After closing arguments were made, the judge determined that the appellant was *Page 714 
guilty as charged in the indictment and scheduled the sentencing hearing for September 5, 1984, at 8:30 a.m. At the sentencing hearing, certified copies of entries of five prior convictions were made. These included convictions of false pretense; grand larceny; first degree forgery; and two escapes. The court then sentenced the appellant as a habitual felony offender to life in prison without parole.
 I.
Appellant's first grounds for appeal concerns the propriety of the court's admission of appellant's tape-recorded confession into evidence. According to the recorded statement, as well as the testimony of the State's witnesses, the appellant made the initial contact with Investigator Parker and indicated that he wished to talk with Parker. In the statement, the appellant agreed that his rights had been explained to him and that he understood those rights. Although the appellant now maintains that he was under the influence of drugs at the time the confession was made, he concluded at trial that the drugs, if actually taken by him, were necessary for him to be able to function. Additionally, Investigator Parker testified that the appellant appeared to be aware of what he was doing and did not seem to be under the influence of drugs at the time the statement was made. At trial, the appellant also admitted that he had lied on other occasions and would tell a lie if it would benefit him. The appellant stated that, at the time the statement was made, he was alert enough to know that he should try to protect his girlfriend; to have someone call Investigator Parker; to know what his rights were; and to know that he was going to give a voluntary statement.
In the present case, conflicting evidence was presented to the trier of fact for his consideration on the issue of whether the confession was voluntary. Sales v. State, 432 So.2d 560
(Ala.Cr.App. 1983). Where the trial judge determines, on conflicting evidence, that a confession has been voluntarily made, such a finding will not be disturbed on appeal unless it is found to be "palpably contrary to the weight of the evidence." Harris v. State, 420 So.2d 812, 815 (Ala.Cr.App. 1982). See also: Myers v. State, 401 So.2d 288 (Ala.Cr.App. 1981); Balentine v. State, 339 So.2d 1063 (Ala.Cr.App.), cert.denied, 339 So.2d 1070 (Ala. 1976). Here, the evidence presented, although in conflict, clearly supports the trial court's decision that the confession was made voluntarily. Additionally, there was overwhelming evidence presented at trial, which connected the appellant to the crime. Thus, notwithstanding the admission of the statement into evidence, proof of appellant's guilt was firmly established by the evidence.
 II.
Appellant's second grounds for appeal is the "failure of the State to prove corpus delicti." Although the state pathologist admitted that he could not conclusively identify the body that he had examined, the identity of the victim was established by other testimony presented at trial. Such testimony is sufficient, in a murder case to prove the identity of the victim even in those cases where the body has decomposed.McCloud v. State, 401 So.2d 314 (Ala.Cr.App. 1981). In a prosecution for murder, the corpus delicti is a fact, proof of which may be made by circumstantial evidence. Dolvin v. State,391 So.2d 666 (Ala.Cr.App. 1979), affirmed, 391 So.2d 677 (Ala. 1980). In the present case, a broad array of evidence[5] was presented to the trier of fact. From this evidence, it was reasonable to conclude that the body recovered by the authorities was that of the victim, Stanley Tucker. DeSilvey v.State, 245 Ala. 163, 16 So.2d 183 (1943). Even where the body of a victim has been completely destroyed, circumstantial evidence has been held to be sufficient and *Page 715 
competent evidence to prove the corpus delicti. Lewis v. State,220 Ala. 461, 125 So. 802 (1930). Of course, circumstantial evidence affords satisfactory proof of the corpus delicti in a murder case where the evidence excludes "every reasonable hypothesis except that of guilt." Barnes v. State,429 So.2d 1114, 1119 (Ala.Cr.App. 1982).
Additionally, both the appellant and Johnny Payne admitted that they were present when Stanley Tucker was killed, although Payne's complicity in the murder is a disputed fact which must then be presented to the trier of fact. Flanagan v. State,369 So.2d 46, 48 (Ala.Cr.App. 1979).
In the present case, the defendant waived his right to a jury trial. Thus, this court must adhere to the general rule that the judgment of a trial court upon evidence taken ore tenus
will not be disturbed on appeal unless such judgment is plainly contrary to the weight of the evidence. Messelt v. State,351 So.2d 640, 641 (Ala.Cr.App.), cert. denied, 351 So.2d 642 (Ala. 1977). Mosely v. State, 53 Ala. App. 272, 299 So.2d 317 (1974),cert. denied, 292 Ala. 743, 299 So.2d 319 (1974). This rule has been stated as follows:
 "In non-jury cases, the judgment of the trial court, when based on testimony ore tenus, will be affirmed unless the judgment was clearly wrong or so contrary to the weight of the evidence as to be manifestly unjust." (Citations omitted). Duncan v. State, 456 So.2d 359 (Ala.Cr.App. 1983), affirmed, 456 So.2d 362
(Ala. 1984).
Here, the evidence presented to the trier of fact established the corpus delicti and thus there was no error.
 III.
As the third grounds for appeal, appellant submits that the trial court erred when it denied his pro se motions for discovery. Although appellant cites Rule 18 of the TemporaryAlabama Rules of Criminal Procedure as authority for this position, this rule did not become effective until April 1, 1984. Since the motions were denied prior to this date, this rule would not govern the trial court's actions. Additionally, the granting or denial of a discovery motion is within the discretion of the trial court. Wicker v. State, 433 So.2d 1190
(Ala.Cr.App. 1983); Mardis v. State, 423 So.2d 331 (Ala.Cr.App. 1982). In the present case, there is nothing in the record to show that the trial court abused its discretion in denying the appellant's pro se motions for discovery, since he was represented by counsel at the time. Thus, the decision was proper.
For the reasons outlined above, the decision of the trial court is due to be affirmed.
AFFIRMED.
All the Judges concur.
[1] Although it is not clear from the record, it would appear that "Linward Hurst" is one and the same as "Cosmos Hurst," the person originally implicated by the appellant as the murderer of Tucker.
[2] Evidently, there were two residences of the appellant. One was located just inside Jackson County and the other was located "over at the swimming pool in Ft. Payne."
[3] Although it is not clear from the record, it would appear that "Cosby Linward Hurst" is one and the same as "Cosmos Hurst," who was implicated by the appellant as the person who murdered Tucker.
[4] Payne later testified that, while at the hardware store, the appellant asked him if he wanted to rob Tucker. According to Payne, he informed the appellant, at that time, that he did not want to do that.
[5] This evidence included testimony concerning the victim's tattoos; the physical evidence concerning the clothes which the victim was last seen wearing; and the identification of the jacket and belt buckle which belonged to the victim.